Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 CR 57-1 * 2 | DATE | 9/9/2002 |
| CASE TITLE | USA vs. Victor Hugo Contreras and Gregorio Macedo | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum and Opinion Order, Defendants' objections to the Government's determination of the applicable base offense level of defendants is DENIED.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 12 2002 | 151 |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| mds(lc) | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 01 CR 57 ) ) HONORABLE DAVID H. COAR |
| VICTOR HUGO CONTRERAS, and GREGORIO MACEDO | ) ) ) |
| Defendant. | ) |



## MEMORANDUM OPINION AND ORDER

Before this Court are Defendants Victor Hugo Contreras, Gregorio Macedo, and Francisco Maldonado Herrera ("Defendants") objections to the Government's determination of the applicable base offense level of defendants. The Government's position is that, pursuant to United Stated Sentencing Guideline Section 2D1.1, the Defendants' base offense level is 36 because the offense involved at least 500 grams, but less than 1.5 kilograms of actual methamphetamine. There is no contest that the gross weight of the drugs recovered from the shoes of defendants Maldonado and Mendez contained 878.8 grams of methamphetamine. Rather, Defendants' object to the determination as to the purity of the drugs. Defendants argue that the methodology that the DEA Lab technician used to determine the purity of the methamphetamine did not result in the extraction of a representative sample of the bulk whole; therefore, the percentage of methamphetamine found in the samples she used (each sample was less than 0.02 grams) is not representative of the whole of the substance contained in the shoes.

*The DEA Lab Technician's Process*

DEA chemist Camala Dubach ("Dubach") testified that she employed the "cone and quartering" method to reduce the gross amount of drugs to a representative sample for quantitative analysis. She chose this method because of the three methods available to her, coning and quartering was, in her opinion, the best method that would get an accurate representative of the whole. The other two methods she could have chosen were the "cone and sampling" method and the "bore" method. She testified that the gross amount of drugs was too large to employ the cone and sampling method, and the bore method was not feasible because the drugs did not have a thick enough mass.

Dubach used the same procedure for Exhibits 1 and 2, which were analyzed separately. When Dubach received Exhibits 1 and 2, each exhibit contained a pair of men's black, dress shoes. Inside the soles of the shoes were brown- or tan-colored, sole-shaped taped packages, and the methamphetamine was inside the tape. After assuring that the contents of the exhibits roughly matched the description on the accompanying forms, Dubach determined the weight of the methamphetamine mixture by subtracting the weight of the tape packaging alone from the weight of the gross weight of the brown, sole-shaped packages. The net weight of the methamphetamine mixture of Exhibit 1 was 441.9 grams and the net weight of the methamphetamine mixture of Exhibit 2 was 436.9 grams, for a total net weight of 878.8 grams. During the hearing, this was referred to as "the bulk whole."

After obtaining the net weight for each exhibit, Dubach began the process of analyzing each exhibit. She analyzed each of the exhibits separately, never combining the drugs recovered from one pair of shoes with the drugs recovered from the second pair of shoes. Dubach placed a

piece of brown craft paper on the table top in her hood and visually inspected each exhibit. Each sole-shaped molded blocks of compressed powder appeared consistent or uniform with respect to color and texture. After visually determining that the compressed powder in each sole seemed uniform, she performed a "color test" by taking equal portions from each exhibit. This test was a presumptive test that was used to determine uniformity as well as the presence of methamphetamine. The color tests for both exhibits indicated the presence of methamphetamine. In addition, the color intensity and reaction time for each color test were the same.

After Dubach's visual exam and the color test showed that the molds were uniform, she combined the two molds from the soles of Exhibit 1 (later doing the same for the drugs from Exhibit 2) for further testing. Dubach then began to reduce the particle size of the exhibit by using a glass pestle to break up what previously had been two solid chunks into varying sizes of smaller pieces, all the while visually observing the appearance and uniformity of the matter (she looked for any indications of nonuniformity, such as striations or veins.) Even after reducing particle size in this manner, there were a few chunks that were in the range of an inch and an inch and a half, while there were other smaller chunks ranging from a few milimeters to a centimeter. Dubach did not grind the entire mixture in the exhibit into a fine powder before she began the cone and quartering process.[1]

---

[1] Dubach testified that, in her opinion, it was not necessary to grind and homogenize the entire product prior to coning and quartering. She gave several reasons why she did not grind the whole mound of drugs: (1) if solvents were present, some will evaporate and the sample will test more pure; (2) if moisture is present, it will attach and the sample purity will be diluted; (3) breaking up such a large amount of drugs could present a health hazard because the powder can aerosol and be inhaled; (4) the grinding of the whole mound would produce more dust and she would be inhibited from observing the particles and therefore would not be able to watch for uniformity of the particles; and (5) for the forensic preservation of evidence, i.e., in case the bulk had to be reanalyzed or identified in court. She testified that her objective was to obtain the smallest sample possible to analyze without compromising it as a representative sample of the whole.

The cone and quartering process entails taking the entire mixture in the exhibit and forming a conical pile with a plastic scoop. She then flattened the pile using a metal blade, forming a circular disk. With a metal spatula, she divided the disk into quarters. Two opposite quarters were set aside, and the two remaining quarters were used for further coning and quartering. Before she conducted another round of coning and quartering, Dubach further reduced the particle size of the remaining mixture. The cone and quartering procedure was repeated a total of four times in this case.

At the end of the last coning and quartering, Dubach had approximately 25 to 40 grams of the mixture remaining, which was a fine powder that was a workable product. Dubach referred to this as a "rough composite." Dubach placed the rough composite in a mortar and reduced the particle size even further by grinding the rough composite with a pestle. Dubach's goal was to reduce the particle size to a level such that the mixture would pass through a 20-mesh sieve so that the majority of the particle sizes were equal. On the first pass, not all of the rough composite passed through the 20-mesh sieve, so Dubach attempted several times to further reduce the particle size. In the end, not all of the rough composite passed through the sieve. Nevertheless, all of the material that had made up the rough composite--that which passed through the sieve and that which did not--was recombined into a "composite" and used for further analysis.

Dubach then used the composite to perform three qualitative tests to confirm that the composite was, as indicated by the presumptive tests discussed above, methamphetamine: a gas chromatography/mass spectrometry test, an infrared spectrophotometry test, and a TPC derivatization on a gas chromatograph. These three tests confirmed that the composite contained D-methamphetamine hydrochloride. (She also found the presence of brompheniramine in Exhibit 1).

Dubach then performed a quantitative analysis using gas chromatography to determine the purity of the composite. This test is performed by taking two portions that equaled less than 1/100 of 1% of the bulk whole from the composite--one portion weighed 99.5 mg and the other portion weighed 135.5 mg--and placing them into solvents.[2] These liquid mixtures were run through a laboratory instrument that provides a printout showing visually the composition of the liquid mixture. The results of this printout are compared to a known reference standard of methamphetamine to determine the percentage of pure methamphetamine--in this case, the methamphetamine for each exhibit was approximately 91%.

*Defendants' Objections to the Government's Procedure*

Defendants produced the expert testimony of Dr. Robert Moriarty ("Moriarty"), who testified that, in his opinion, the testing samples extracted by the Dubach were not representative of the whole. Moriarty opined that, when dealing with a bulk whole of a pharmaceutical in chunky form and of unknown composition, a technician first must grind and homogenize that whole *before* the coning and quartering process is applied or the result does not truly represent the chemical and component composition of the whole. Moriarty further criticized Dubach's failure to grind the entire sample to a fine enough powder to pass through the 20-mesh sieve and her re-combining the sample portions that did and did not pass through the sieve.

Moriarty testified that, in what he loosely called the "industry standard," grinding and homogenizing the entire bulk of an exhibit is a predicate, or a crucial first step. In his opinion, because Dubach did not grind the entire bulk before coning and quartering, her results were

---

[2] She analyzed two portions of the composites to make sure she or her instrument would not make an error in determining the purity. Further, she used two samples of relatively different weights to test that the purity remained the same notwithstanding the size of the sample.

"totally invalidated." When this Court questioned Moriarty as to what industry he was referring, he responded his experience in the pharmaceutical industry.

*Analysis*

At sentencing, the government must prove an amount of drugs attributable to a defendant by a preponderance of the evidence. United States v. James, 113. F.3d 721, 730 (7th Cir. 1997). The facts upon which the court relies must have "sufficient indicia of reliability to support [their] probable accuracy." Id. (quoting United States v. Salinas, 62 F.3d 855, 859 (7th Cir. 1995)). Further, as long as "nebulous eyeballing" is avoided, "factual determinations under the Guidelines need not emulate the precision of Newtonian physics." Id. at 731.

The Government has shown that cone and quartering has been recognized as a valid method of obtaining a representative sample from a larger mass for many years, in many industries and for many types of substances, including analytical chemistry and specifically for drug analysis. In fact, even Moriarty acknowledged that there is nothing inappropriate about the method. Rather, he claimed that the only fault he found was that Dubach did not grind the entire 878.8 grams of methamphetamine before coning and quartering it. Neither he nor the Defendants object to the 91% purity finding for the samples tested; their objection is that the composite sample is not sufficiently representative of the whole. Thus, Moriarty's position is that, had Dubach ground the entire mass before coning and quartering, there would be a higher probability that the resulting composite would exactly duplicate the purity of the whole mass.

The question before this Court, therefore, is whether Dubach's choice not to grind the whole bulk before coning and quartering invalidated her result that the 91% methamphetamine found in the composite represented the amount of methamphetamine present in the whole bulk. This Court finds that it did not. While Dubach did not grind the whole bulk for forensic

-6-

preservation of evidence, even Moriarty concedes that she randomized the particle sizes before coning and quartering it down to the composite that she ultimately tested. Thus, she did not arbitrarily break off a chunk or "nebulously eyeball" a portion to sample; she made sure the matter was uniform and broke it down into smaller particles before coning and quartering. By arguing that Dubach should have done more, that she should have ground the entire bulk to a powder, Defendants' essentially are arguing that the Government's finding is not as precise or as accurate as it could be. However, since factual determinations need not emulate the precision of Newtonian physics, this Court finds that Dubach's coning and quartering resulted in a reasonably representative sample. The Government has shown, by a preponderance of the evidence, that the drugs recovered from Exhibit 1 and Exhibit 2 contained 91% of actual methamphetamine. It therefore has met its burden of proving the amount of drugs in this offense--799.7 grams of actual methamphetamine--and the base offense level under the Guidelines is 36.

**Enter:**

_David U Coar_

**David H. Coar
United States District Judge**

**Dated: September 9, 2002**